PAN AMERICAN REALTY TRUST

v.

TWENTY ONE KINGS, INC., Appellant

No. 17,386

DE LEO ASSOCIATES COMPANY

v.

TWENTY ONE KINGS, INC., Appellant

No. 17,387

United States Court of Appeals

Third Circuit

Argued January 30, 1969
Decided March 24, 1969
*See, also, 6 V.I. 332; 408 F.2d 937*

JOHN D. MARSH, ESQ., Christiansted, St. Croix, Virgin Islands, *for appellant*

JAMES, HODGE & TONKIN, Christiansted, St. Croix, Virgin Islands (RONALD H. TONKIN, ESQ., for counsel), *for appellee*

Before FREEDMAN, VAN DUSEN and ALDISERT, *Circuit Judges*

OPINION OF THE COURT

PER CURIAM:

Defendant (appellant) challenges judgments entered February 5, 1968, in two civil actions, which were consolidated for trial to the court, contending that the trial judge incorrectly interpreted separate building and architectural contracts under which plaintiffs had rendered the services for which they recovered on a quantum meruit basis. Pan American Realty Trust recovered a judgment of $27,823.14 for engineering services and expenses, with interest from April 12, 1966, an attorney's fee of $2,500, and costs. The judgment for De Leo Associates Company

was for architectural services and expenses in the amount of $30,196.75, with interest from April 12, 1966, an attorney's fee of $2,500, and costs.

## I. No. 17,386

 The building contract was dated December 3, 1965, and provided for payment "in current funds" of costs of construction of an Apartment-Office and Underground Parking Building, plus a fee of $35,000, by the defendant-owner. Articles 13 and 14 provided:

"The Contractor shall, between the first and seventh of each month, deliver to the Architect a statement, sworn to if required, showing in detail and as completely as possible all moneys paid out by him on account of the cost of the work during the previous month for which he is to be reimbursed . . . .

. . .

"The Architect shall check the Contractor's statements of moneys due, . . . and shall promptly issue certificates to the Owner for all such as he approves, which certificates shall be payable on issuance."

A rider to this contract, executed the same day, specified that "The contractor agrees to supply all additional funds needed to complete the job that is not raised by a first mortgage, . . . [which funds were to] be advanced at the beginning of the job."[1] A second rider dated December 8,

---

[1] This rider read as follows:

"In consideration of the mutual promises flowing between the parties hereto and the consideration in the main contract it is mutually agreed as follows:

"1. The contractor agrees to supply all additional funds needed to complete the job that is not raised by a first mortgage.

"2. As security for said funds so advanced the contractor agrees to accept and the owner agrees to execute a second mortgage for the amount so advanced. Said second mortgage shall bear interest at same percent charged by bank and be payable at $300.00 per month, inclusive of interest, for a period of five (5) years. Said mortgage may be prepaid at any pay period in multiples of $300.00, without penalty.

"3. Said mortgage shall be executed and delivered at the completion of the job when it has been determined what the amount of the mortgage is to be. Also, said mortgage will be executed and delivered after the bank has executed and filed its mortgage.

"4. The contractor agrees to retain William C. Raines during the duration of this job for coordinating and doing legal work. The sal-

1965 specified that "The contractor shall commence with the work under the main contract without undue delay."[2] The defendant-owner never secured the first mortgage contemplated by the contract and unilaterally cancelled the contract on April 12, 1966.[3] Meanwhile, the contractor had rendered the services and incurred the expenses comprising the $27,823.14 described above. Construing the above documents together in Pan American Realty Trust v. Twenty One Kings, Inc., 6 V.I. 332, (1968), the trial judge:

". . . concluded that until the owner had secured a commitment for a first mortgage loan the contractor was not obligated to advance the additional funds beyond that loan which would be needed to complete the building contract. For, until that event occurred, it would not be possible to know what amount of additional funds would be needed. But if, and when, a first mortgage commitment was secured the plaintiff contractor could know exactly how much additional money had to be put up and then could proceed to do so.

\* \* \*

". . . A cardinal principle governing the construction of contracts is that the entire contract must be considered and, as between possible interpretations of ambiguous provisions, that will be chosen which best accords with the sense of the remainder of the con-

---

ary for said William C. Raines shall be $200.00 per month, and is to commence upon notice by William C. Raines to the Contractor.

"5. Since bank funds will not be released until the job has progressed to a certain stage, it is agreed by the contractor that the funds to be advanced as herein outlined shall be advanced at the beginning of the job.

"6. The contractor agrees to proceed with this job immediately."

[2] Other terms of this rider contemplating payment by the first mortgagee of amounts due the architect on December 8, 1965, are referred to under II, below.

[3] The trial judge found that the defendant made false representations to a financial institution in order to persuade it to commit itself to a first mortgage. The testimony discloses that these representations included a false statement that $200,000 had been released to Pan American for materials to be stockpiled and that an officer of the plaintiff advised this institution that the above representations were false (Exhibits P-10—P-14). Shortly thereafter (within a month), the contract was cancelled by defendant. Since the President and sole stockholder of defendant, who testified that "I am Twenty One Kings", admitted at least once during the trial that he had testified inaccurately, the trial judge would have been justified in rejecting his testimony.

tract. A written contract is to be construed so as to give effect to all of its parts, and any construction which would render the agreement meaningless should be avoided.[4] . . . [T]hese obligations of the contractor were conditioned upon the prior procurement by the defendant of a commitment for a first mortgage loan. To accept the defendant's view would be to render the contract unworkable and meaningless. The defendant, having been unable to secure the contemplated first mortgage commitment, did not perform its part of the contract, and thereby discharged the plaintiff from the duty of further performance by the impossibility of rendering it. . . . [T]he plaintiff contractor, upon notification from the defendant under date of April 12, 1966 to 'do nothing further under the provisions of this contract' was entitled to treat the contract as absolutely and finally broken by the defendant. . . . Accordingly upon the defendant's rescission of the construction contract the plaintiff was entitled to recover the money it had actually expended and for the services it had actually performed."[5]

After careful consideration of the record and the contentions of defendant, we have decided that the judgment should be affirmed for all the reasons stated by the trial judge.[6]

---

[4] This reasoning is in accord with the following language of § 235(c) of the Restatement of Contracts, relied on *inter alia* by defendant:

"A writing is interpreted as a whole and all writings forming part of the same transaction are interpreted together."

See New Wrinkle v. John L. Armitage & Co., 238 F.2d 753, 757 (3rd Cir. 1956); cf. The Kronprinzessin Cecilie, 244 U.S. 12, 24 (1917), where the court said:

"Business contracts must be construed with business sense, as they naturally would be understood by intelligent men of affairs."

[5] See, also, findings and conclusions of January 25, 1968.

[6] Since defendant's action in failing to get the first mortgage (particularly in its misrepresentations making it difficult to obtain such mortgage—see footnote 3) and its unilateral cancellation of the building contract were a total breach of both contracts, § 347 of the Restatement of Contracts specifies the applicable measure of damages as follows:

"(1) . . . the injured party can get judgment for the reasonable value of a performance rendered by him, measured as of the time it was rendered, . . . if the performance so rendered was

(a) a part of all of a performance for which the defendant bargained; . . .

* * *

"(2) Interest at the legal rate, on the value of the performance as to which restitution in money is adjudged, may be given from the date of receipt of the performance."

Comments b and c of § 347 include this language:

"b. . . . In granting restitution as a remedy for breach, however, the

## II. No. 17,387

The architectural contract, dated February 26, 1965, provided for a fee not to exceed $15,000 plus expenses of personnel, including consultants for surveys, soil tests, auditing, etc., as well as reimbursable transportation and living expenses.[7] Most of the work done under this contract, as amended, was completed prior to the execution of the building contract in December 1965. In the above-mentioned rider dated December 8, 1965, defendant agreed that "$14,500 more or less" of the architect's fee was unpaid and that expenses were due the architect, which sums then due were to be paid by defendant "during construction". This rider also provided "First monies paid by financial institution financing construction shall be allocated to architects fees."

■ For the reasons stated under I above and those in the findings, conclusions and April 29, 1968, opinion of the trial judge, the record justifies the trial judge's conclusion that the failure of the defendant to raise the first mortgage

---

purpose to be attained is the restoration of the injured party to as good a position as that occupied by him before the contract was made. . . . [I]n the great majority of cases this remedy merely requires a payment in money by the defendant of the value of the consideration received by him from the plaintiff as a part or full performance of the contract. The consideration so received may be of any kind, commonly consisting of services rendered, . . . .

"c. If the plaintiff's performance is part of the very performance for which the defendant bargained as part of an agreed exchange, it is to be valued, not by the extent to which the defendant's total wealth has been increased thereby, but by the amount for which such services and materials as constituted the part performance could have been purchased from one in the plaintiff's position at the time they were rendered." Section 468(1) of the Restatement of Contracts, cited by the learned trial judge, is an application of the basic principle stated in the above-quoted § 347(1). Section 468(3) and the comment thereon (d), relied on by defendant, applies where there has been "no fault on either side," which is not the situation presented in this record. The language in most of the sections of Chapter 14 of the Restatement of Contracts governing IMPOSSIBILITY makes clear that the rules there stated apply "in the absence of . . . contributing fault on the part of the person subject to the duty" (or "of the promisor"). See §§ 458–461.

[7] Additional work was required of the architect by changes in the owner's plans made in August 1965.

money, which it had agreed to use to pay the architect, did not relieve it from liability for the expenses incurred, and fees earned, by the architect before the unilateral cancellation of the contract by defendant on April 12, 1966.

The judgments entered February 5, 1968, will be affirmed.